Patrick Theodore SMITH; Nancy Lee Smith Hart; Barbara Ann Smith; and Doreen Esther Smith, Plaintiffs,

v.

Bruce BABBITT, U.S. Secretary of Interior; Kevin Gover, Assistant U.S. Secretary for Indian Affairs; and Angela Lagarde, Welsa Project Director, Defendants.

No. CIV. 98–1302(JRT/RLE).

United States District Court,
D. Minnesota.

May 11, 2000.

Paul G. Thibeault, Anishinabe Legal Services, Cass Lake, MN, for plaintiffs.

Friedrich A.P. Siekert, Assistant United States Attorney, Office of the United States Attorney, Minnepaolis, MN, for defendants.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

TUNHEIM, District Judge.

Plaintiffs filed this action in order to challenge the final administrative decision of the Interior Board of Indian Appeals ("IBIA"), an adjudicative body within the United States Department of the Interior ("DOI"), regarding an heirship determination under the White Earth Reservation Land Settlement Act of 1985 ("WELSA"),

100 Stat. 61, *as amended* 101 Stat. 887, found as a note to 25 U.S.C. § 331. In its decision the IBIA determined that plaintiffs are not the heirs of the decedent, Esther Bellecourt Smith, for purposes of entitlement to compensation under WEL-SA. This matter is before the Court on defendants' motion for summary judgment affirming the IBIA's decision, and on plaintiffs' cross-motion for summary judgment reversing that decision.

## BACKGROUND

Plaintiffs are the children of Theodore Simon Smith, who is the son of Esther Bellecourt Smith. Theodore Simon Smith predeceased Esther Bellecourt Smith, who died on November 6, 1980. Plaintiffs all were born between 1962 and 1969. At the time of each of the plaintiffs' birth, Theodore Simon Smith was living with their mother, Alice Windom, but was not married to her according to a marital contract established under the laws of the State of Minnesota.[1] Nevertheless, according to plaintiffs their parents were married at the time they were born according to the customs of the Chippewa Tribe. The IBIA's determination that plaintiffs are not heirs entitled to WELSA compensation is due primarily to their alleged status as "illegitimate"[2] children seeking to inherit the right to compensation from their paternal grandmother.

In the administrative proceedings below, the Administrative Law Judge ("ALJ") issued an initial determination on June 12, 1997 that plaintiffs were entitled to inherit WELSA compensation from Esther Bellecourt Smith. In his determination, the ALJ rejected plaintiffs' contention that they were the legitimate children of Theo-

dore Simon Smith pursuant to an Indian "custom law" marriage.[3] The ALJ nevertheless determined that plaintiffs were legitimate pursuant to federal law, 25 U.S.C. § 371, and thus heirs of the decedent for purposes of distribution of WELSA compensation.

The Bureau of Indian Affairs ("BIA"), acting through the Area Director of the Minneapolis Area Office (the "Area Director"), appealed the ALJ's determination to the IBIA. In response, plaintiffs filed a motion to dismiss on the ground that the Area Director did not have standing to appeal the ALJ's decision. The IBIA rejected this argument and accordingly denied plaintiffs' motion to dismiss. The IBIA thereafter reversed the ALJ's decision, holding that 25 U.S.C. § 371 is inapplicable to WELSA heirship determinations. Moreover, although plaintiffs argued in response to defendants' appeal that the ALJ's determination of the custom law marriage issue was erroneous, the IBIA declined to address their argument on the merits. In doing so, the IBIA held that plaintiffs were attempting to appeal the portion of the ALJ's order which held that they were not legitimate children of a custom law marriage, and furthermore, that their appeal was untimely under the applicable regulations. On these grounds the IBIA affirmed the ALJ's determination of the custom law marriage issue, but reversed and remanded the matter to the ALJ for an order consistent with its holding that 25 U.S.C. § 371 was inapplicable. The ALJ reluctantly entered a final amended order excluding plaintiffs as heirs on November 7, 1997, and this appeal followed.

---

1. Theodore Simon Smith and Alice Windom subsequently were married in a ceremony recognized under Minnesota law in 1971. Plaintiffs have not argued at any time during administrative or judicial proceedings in this matter that this subsequent marriage affects their status for purposes of determining heirship under WELSA.

2. The Court uses the term "illegitimate" in this case, as it has been used historically

under Minnesota law, to refer to children whose parents were not married either at the time of their conception or birth.

3. The record reflects, and defendants do not dispute, that under the customs of the Chippewa Tribe couples who cohabitate with the intention of living as husband and wife are considered to be married.

## ANALYSIS

### I. Jurisdiction and Standard of Review

Plaintiffs premise federal jurisdiction to consider their appeal, *inter alia*, on 28 U.S.C. § 1331, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 704, on the ground that their claims arise from a final agency decision of the DOI for which there is no other adequate remedy. The parties do not contest the Court's jurisdiction, and the Court agrees that federal jurisdiction to consider plaintiffs' appeal arises under the cited statutes. *See Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); *Runs After v. United States;* 766 F.2d 347, 351 (1985).

 In reviewing a final agency decision, a court must examine and consider the whole administrative record, and set aside the decision if it is arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(a); *Runs After,* 766 F.2d at 351. In reviewing an agency's interpretation of a statute that it administers, a court must first determine whether the statute is ambiguous. *See Sierra Club v. Davies,* 955 F.2d 1188, 1193 (8th Cir.1992) (citing *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). If Congress has expressed its intent unambiguously then the court, and the agency, must give effect to that intent. *See id.* If, on the other hand, the statute is ambiguous, then the court must defer to the agency's interpretation when that interpretation is reasonable and does not frustrate the purposes of the statute. *See id.*

### II. Standing

Plaintiffs assert that the IBIA erred in finding that the Area Director had standing to appeal the ALJ's decision. Plaintiffs point to the DOI regulations governing the determination of heirs of persons entitled to inherit compensation under WELSA. 43 C.F.R. §§ 4.350–4.357. These regulations provide that "parties in interest" for purposes of WELSA heirship determinations include "the Project Director

and any presumptive or actual heirs of the decedent, or of any issue of any subsequently deceased presumptive or actual heir of the decedent." 43 C.F.R. § 4.350(c)(4). When the Area Director filed his appeal to the IBIA in this matter, the regulations defined "Project Director" as "the officer in charge of the White Earth Reservation Land Settlement Branch of the Minneapolis Area Office, [BIA], at Cass Lake, Minnesota." 43 C.F.R. § 4.350(c)(3) (1997). The DOI amended this regulation on March 18, 1999, modifying the definition of "Project Director" as "the Superintendent of the Minnesota Agency, [BIA], or other [BIA] official with delegated authority from the Minneapolis Area Director to serve as the federal officer in charge of the White Earth Reservation Land Settlement Project." 43 C.F.R. § 4.350(c)(3) (1999).

Plaintiffs argue that the Area Director was not a "party in interest" with standing to appeal the ALJ's decision, because under the regulations applicable at that time he did not fall within the definition of a "Project Director." Plaintiffs further contend that by explicitly including the "Project Director" within the definition of parties in interest, the DOI intended to preclude all other administrative officials from appealing heirship determinations.

The IBIA rejected plaintiffs' argument on two grounds. First, the IBIA noted that at the time the governing regulations were enacted in 1991 the position of "Project Director" was held by a BIA official, as evidenced by the definition of that term as the officer in charge of a branch of the BIA Minneapolis Area Office. In 1995, however, the BIA signed a contract with the White Earth Band of Chippewa Indians ("White Earth") pursuant to the Indian Self–Determination Act, 25 U.S.C. § 450(f). Under the terms of the contract, the BIA assigned to White Earth many of the functions performed by the Project Director in connection with the administration of the WELSA project. The BIA position of "Project Director" was elimi-

nated in the process, and the White Earth official who took over many of the former Project Director's duties became commonly known as the WELSA Project Director.

Plaintiffs appear to contend that BIA contracted to White Earth not only the administrative duties of the Project Director, but also his or her standing to appeal the heirship determinations of the ALJ. Plaintiffs suggest that the White Earth official known as the Project Director was the only person, other than the putative heirs of the decedent, who had standing to appeal the ALJ's decision.[4]

In addressing this argument, the IBIA took official notice of the contract between the BIA and White Earth.[5] The IBIA noted that the contract did not purport to transfer to White Earth all of the Project Director's duties, but rather, some "noncontractible" functions were retained by the BIA and performed by the Superintendent of the BIA's Minnesota Agency. These functions include many of the Project Director's responsibilities in connection with the payment of WELSA compensation from federal funds. The IBIA held that under these circumstances the term "Project Director," as defined at 43 C.F.R. § 4.350(c)(3) (1997), "includes the Superintendent of the Minnesota Agency, as well as any other BIA official who is now performing any function which was performed by the Project Director in 1991." The IBIA further held that because the Superintendent of the Minnesota Agency acts under authority delegated to him or her by the Area Director, the Area Director shares the Superintendent's standing to appeal.

As an alternative ground for denying plaintiffs' motion to dismiss, the IBIA noted that under the DOI's general regula-

tions on IBIA proceedings, the BIA is deemed "an interested party in any proceeding before the [IBIA]." 43 C.F.R. § 4.311(c). Plaintiffs contend that the unamended WELSA definition of "party in interest" was in direct conflict with this provision, and that because the WELSA regulations were more specific they controlled the issue of the Area Director's standing. Plaintiffs alternatively contend that section 43 C.F.R. § 4.311 does not permit the BIA to initiate appeals to the IBIA, but only to participate in such appeals when filed by another party. The IBIA rejected these contentions, holding instead that the WELSA regulations, as interpreted by the IBIA, were not in conflict with the general appeals provision at 43 C.F.R. § 4.311(c). The IBIA further held that the BIA, through the Superintendent or the Area Director, has standing under 43 C.F.R. § 4.311(c) to initiate appeals to the IBIA when an ALJ's decision creates a conflict in the law. Reasoning that the ALJ's decision in this case creates a conflict with prior WELSA heirship determinations, the IBIA held that the Area Director had standing to initiate an appeal.

■ On motion to this Court, plaintiffs restate the arguments that they asserted in their submission to the IBIA. The IBIA is a branch of the DOI, and therefore, its decision is based on an agency's construction of regulations that it was responsible for enacting. On review of an agency's interpretation of its own regulations courts must be very deferential, and may reverse the agency's decision only if it is without a rational basis. *See Missouri v. United States Dept. of Educ.*, 953 F.2d 372, 375 (8th Cir.1992).

---

4. The acting WELSA Project Director for White Earth at the time of the ALJ's decision was Angela M. Legarde ("Legarde"). On September 8, 1997, Legarde sent a letter to the IBIA requesting that it uphold the decision of the ALJ and asking the IBIA to remand the matter for a determination of whether the Area Director had standing to appeal.

5. Defendants offer a copy of the contract into evidence in connection with their motion to this Court. Because the entire contract was not already a part of the administrative record, the Court takes it into account only to the extent that the IBIA took official notice of it in issuing its decision.

■ The Court finds that the IBIA had a rational basis for interpreting its regulations to confer standing upon the Area Director to initiate the administrative appeal. The structural changes to the administration of the WELSA project recognized in the IBIA's decision explain the need to construe the term "Project Director" broadly to include other BIA officials performing the duties held by the existing Project Director at the time of the regulation's enactment. Plaintiffs offer no persuasive argument as to why the BIA, in contracting some of its administrative functions to White Earth, would intentionally divest itself of its right to appeal ALJ decisions that are in conflict with prior agency interpretations of WELSA. Nothing in the Indian Self–Determination Act requires the BIA to do so, and plaintiffs point to no language in the contract at issue suggesting such an intent.

Moreover, under plaintiffs' interpretation the DOI's ability to administer WELSA properly would be severely impaired, as the BIA would be without recourse to address aberrant ALJ determinations and would be forced to let such decisions stand uncontroverted. The Court in not persuaded that by restructuring the Project Director's duties the BIA intended such a result. Rather, the IBIA's determination that the former Project Director's right to appeal reverted to other BIA officials is more in keeping with the administrative scheme and the regulatory requirement that the Project Director be an officer of the BIA. *See* 43 C.F.R. § 4.350(c)(3) (1997).

Furthermore, the DOI's 1999 amendment to the regulation confirms the DOI's interpretation. As amended, the provision at issue now defines the Project Director to include the Superintendent of the Minnesota Agency "or other [BIA] official with delegated authority from the Minneapolis Area Director ...." 43 C.F.R. § 4.350(c)(3) (1999). Since the Minneapolis Area Director could delegate that authority to himself, he plainly falls within the applicable definition, and therefore, has standing under the amended regula-

tion to appeal the heirship determinations of the ALJ. The DOI's decision to modify the regulation in accordance with the IBIA's interpretation of it supports the IBIA's assertion that structural changes within the BIA necessitated a more broad interpretation of the term "Project Director." For these reasons, the Court affirms the IBIA's determination that Area Director had standing to appeal.

### III. Applicability of 25 U.S.C. § 371

■ Plaintiffs argue that the IBIA erred in concluding that 25 U.S.C. § 371 does not apply to WELSA heirship determinations. Section 371 provides:

> For the purpose of determining the *descent of land* to the heirs of any deceased Indian under the provisions of section 348 of this title [regarding Indian lands held in trust by the United States], whenever any male and female Indian shall have cohabited together as husband and wife according to the custom and manner of Indian life the issue of such cohabitation shall be, for the purpose aforesaid, taken and deemed to be the legitimate issue of the Indians so living together, and every Indian child, otherwise illegitimate, shall for such purpose be taken and deemed to be the legitimate issue of the father of such child.

25 U.S.C. § 371 (emphasis added). Plaintiffs assert two distinct grounds for the application of section 371 to the heirship determination at issue in this case. First, plaintiffs contend that the interest they seek to inherit from Esther Bellecourt Smith under WELSA is an interest in land to which section 371 applies. Defendants dispute this characterization, arguing that plaintiffs' alleged interest under WELSA is an interest in monetary compensation, and thus, personal rather than real property.

The Eighth Circuit succinctly outlined the history of WELSA in *Shangreau v. Babbitt,* 68 F.3d 208 (1995). A complete description of that history need not be repeated here. Nevertheless, some of the

historical facts are pertinent to a resolution of the issues raised. In the late 1800s Congress began breaking up parcels of land which were formerly part of the White Earth Reservation in Minnesota, and allotting them to individual Indians in the form of "trust patents" under which the United States would hold the land in trust for 25 years before conveying title in fee simple to each allottee. In the early 1900s a large amount of this restricted Indian land held in trust was conveyed out of Indian ownership following the enactment of the Clapp Amendment. Pursuant to various reinterpretations of the Clapp Amendment and other applicable law, doubts about the legal validity of these transfers arose during the late 1970s. As a result of these changes in the law, title to more than 100,000 acres of land located in the State of Minnesota became clouded.

In 1986 Congress enacted WELSA in order to remove the cloud on the affected land titles. Pursuant to WELSA, the transfers of land at issue were approved and ratified by Congress as valid under the laws and Constitution of the United States. All legal claims to the affected lands held by allotees and their heirs were extinguished, and in exchange, claimants became entitled to monetary compensation for loss of the transferred allotments or loss of their partial property interests in them. Importantly, WELSA explicitly states Congress's intent to ratify the transfers at issue "effective as of the date of transfer," WELSA § 6(a), and further states that any claims to the transferred lands by allotees and their heirs arising subsequent to the transfer "shall be deemed never to have existed as of the date of the transfer," WELSA § 6(b). WELSA thus makes clear that its effect in extinguishing the property rights of potential claimants is retroactive to the date that the transfer occurred.

WELSA directs the Secretary of the Department of Interior to identify the persons entitled to receive compensation under the statute. In order to do so the Secretary is required to determine the heirs of the original allotees of the transferred lands at issue. See WELSA § 9. During the first year of WELSA's existence, the BIA reviewed WELSA and concluded that such determinations should be made according to the personal property laws that were in effect in the jurisdiction of the decedent's domicile on the date of his or her death. The daunting prospect of applying the laws of all fifty states applicable over a period of eighty years was unappealing to the BIA, and it petitioned Congress for an amendment to WELSA which would restrict the scope of the laws applicable in WELSA heirship determinations.

In response, Congress enacted the Indian Law Technical Amendments Act of 1987, Pub.L. No. 100–153, 101 Stat. 886. The amendment modified WELSA's definition of "heir" to include:

> a person who received or was entitled to receive an allotment or interest as a result of testate or intestate succession under applicable Federal or Minnesota law, or one who is determined under section 9 [regarding the determination of heirs], by the application of the inheritance laws of Minnesota in effect on March 26, 1986 (not including laws relating to spousal allowance and maintenance payments), to be entitled to receive compensation payable under section 8 [regarding the determination of WELSA compensation].

WELSA § 3(1).

Plaintiffs contend that the interest Esther Bellecourt Smith held at the time of her death was a legal claim to the share in the allotment that she would have inherited had the improper transfer not occurred. They point out that she died in 1980, prior to the enactment of WELSA, and thus argue that the interest she passed to her heirs could not have been an interest in compensation under WELSA. Based on this assumption, plaintiffs contend that under WELSA's definition of "heirs," they are persons "entitled to receive an allotment or interest" in land rather than persons, under the second half of the definition, claiming an entitlement

to compensation pursuant to WELSA. This distinction is of critical importance, for if plaintiffs are in the first category of persons, "applicable Federal or Minnesota law" governs their right to inherit from the decedent. Moreover, because their interest would be an interest in Indian trust lands, 25 U.S.C. § 371 would plainly apply to the determination of the decedent's heirs. Furthermore, under that statute, plaintiffs would be deemed the legitimate children of Theodore Simon Smith entitled to inherit from the decedent to the same extent as any of her other grandchildren.

If, on the other hand, Esther Bellecourt Smith died possessed of a right to compensation under WELSA rather than a real property interest in land, then the determination of her heirs falls under the second half of the definition. Thus, WELSA would provide that the "laws of Minnesota in effect on March 26, 1986" govern the determination of her heirs. Congress's decision to apply the laws of Minnesota effective on that particular date, the date of WELSA's enactment, is unfortunate. At that time, the Minnesota laws of intestacy provided that a child whose parents were neither married at the time of conception nor at the time of birth could not inherit from his or her father's relatives by right of representation. *See* Minn.Stat. § 525.172 (1984).[6] As plaintiffs' father predeceased Esther Bellecourt Smith, they seek to inherit from her by right of representation. Thus, plaintiffs' status as his illegitimate children would preclude them from inheriting any part of her entitlement to WELSA compensation.[7]

Although plaintiffs' argument is imaginative, the Court is not persuaded by it. The administrative record reflects that Esther Bellecourt Smith was not the original allottee in this case, but rather, an heir to the original allottee, Ah-bid-aus-in-o-quay (a/k/a Marie Smith). Ah-bid-aus-in-o-quay transferred the allotment in 1909, prior to her death in 1928. Upon her death, a portion of any interest that she possessed as a result of the allotment passed to Buz-ay-gosh (a/k/a Charles Smith), from whom Esther Bellecourt Smith inherited it upon his death in 1930.

The language of WELSA unambiguously provides that its effect is retroactive, such that any property interest that the original allottee had in the land was extinguished and "deemed never to have existed as of the date of the transfer." WELSA § 6(b). Thus, Ah-bid-aus-in-o-quay died possessed of an entitlement to WELSA compensation, which eventually passed to the Esther Bellecourt Smith. For these reasons, the fact that Esther Bellecourt Smith died in 1980, prior to the enactment of WELSA, is irrelevant.[8] With regard to the allotment at issue, she died possessed of a personal property entitlement to WELSA compensation that arose on the date of the property transfer, rather than a real property interest in the allotment itself. The determination of her heirs is therefore governed by section 525.172 of the Minnesota Statutes, and plaintiffs' argument that 25 U.S.C. § 371 applies because they seek to inherit an interest in land must be rejected.[9]

6. The Minnesota legislature repealed that provision effective January 1, 1987 and adopted the Uniform Probate Code, making it possible for illegitimate children to inherit from their paternal relatives by right of representation.

7. Addressing a constitutional challenge to WELSA in *Shangreau,* 68 F.3d at 211, the Eighth Circuit held that Minn.Stat. § 525.172 foreclosed an illegitimate child's right to inherit WELSA compensation from a paternal relative under circumstances strikingly similar to the case at bar.

8. Plaintiffs suggest that interpreting WELSA to divest them of the interests in land that

they otherwise might have inherited upon the death of the decedent would violate the Takings Clause of the United States Constitution. Plaintiffs do not raise any constitutional claims in this case, however, and for this reason their argument in this regard is not properly before the Court.

9. The ALJ's contrary holding on this issue is particularly disturbing, because taken to its logical conclusion the majority of claimants under WELSA still possess real property interests in the original allotments at issue. Such an interpretation would entirely nullify the effect of WELSA by clouding the titles

As an alternative ground for applying 25 U.S.C. § 371 to their claims, plaintiffs contend that the interest they seek to inherit constitutes an interest in restricted personal property. They further contend that section 371 applies to such interests. In support of this contention, plaintiffs point to a provision in the general DOI regulations governing IBIA hearings stating that,

> [t]he term *trust property* means real or personal property title to which is in the United States for the benefit of the Indian. In this subpart "restricted property" (real or personal property held by an Indian which he may not alienate without the consent of the Secretary or his authorized representative), is treated as if it were trust property . . . .

43 C.F.R. § 4.201(m). Under this provision, restricted property to which the regulation applies is regarded as if it were trust property. Plaintiffs argue that if WELSA compensation is personal property at all it is restricted personal property, since WELSA regulations prevent recipients from devising their rights to such compensation by will. *See* 43 C.F.R. § 4.350(b). On these grounds plaintiffs conclude that WELSA compensation must be treated the same as the Indian trust lands governed by section 371.

Even assuming *arguendo* that plaintiffs' characterization of the interest at issue as "restricted personal property" is accurate, however, section 371 would not apply to it. Plaintiffs' interpretation of section 371 as applicable to all forms of trust property too broadly generalizes its scope. By its express terms, section 371 applies only to

the "descent of land." Although the regulation to which plaintiffs cite supports an argument for treating trust property and restricted property similarly, nothing therein suggests that interests in personal property and interests in real property are always governed by the same rules. Plaintiffs cite to no case law or IBIA precedent holding that section 371 applies to any form of personal property, including personal property held in trust.[10] Since section 371 plainly applies only to interests in land, and for the above reasons plaintiffs do not seek to inherit an interest in land, section 371 does not apply to their claims. Section 371 therefore does not save plaintiffs from the harsh requirements of the Minnesota intestacy laws in effect on March 26, 1986. For these reasons, the Court concludes that the IBIA's determination on this issue was not arbitrary or capricious.

## IV. Trust Obligation

■ Plaintiffs contend that the IBIA's decision improperly divests them of their rights in Indian trust lands in violation of the government's fiduciary obligations to Indian tribes. The United States Supreme Court has recognized that a special fiduciary relationship between the federal government and Indian tribes exists, stating, "When it holds lands in trust on behalf of the tribes, the United States may not 'give the tribal lands to others, or . . . appropriate them to its own purposes, without rendering, or assuming an obligation to render, just compensation for them.' " *United States v. Cherokee Nation of Okla.*, 480 U.S. 700, 707, 107 S.Ct. 1487,

which Congress sought to clear when it enacted the statute.

**10.** In his June 12, 1997 Order, the ALJ quoted a 1958 treatise on Indian law stating that, "As a matter of practice, the examiners of inheritance, acting for the [DOI] *and applying state law* to the determination of inheritance of real property, commonly apply the same rules to the inheritance of personal property." (Final Order Determining Heirs, at 20–21) (quoting U.S. Dep't of the Interior, Federal Indian Law 836–37 (1958)) (emphasis added). The portion of the treatise quoted by the ALJ indicates that the examiners have traditionally applied the relevant state intestacy laws on real property to heirship determinations involving some forms of restricted personal property. Nevertheless, it does not suggest that the examiners have similarly applied federal laws such as 25 U.S.C. § 371, which explicitly governs only the "descent of land," to such determinations. The ALJ's analysis on this issue is for these reasons unpersuasive.

94 L.Ed.2d 704 (1987) (alteration in the original). The Court has also indicated, however, that this trust obligation extends to Indian tribes as a whole and not to individual Indians in particular. *See Lincoln v. Vigil*, 508 U.S. 182, 194–95, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (citing *Hoopa Valley Tribe v. Christie*, 812 F.2d 1097, 1102 (9th Cir.1986)). Thus, the government's trust obligation compels no particular result in a determination between competing Indian interests.

Plaintiffs argue that the IBIA's interpretation of WELSA in this case will generally result in the distribution of WELSA compensation to non-Indians at the expense of Indians. They offer no supporting argument, however, as to how this might occur. It is conceivable that in some cases the illegitimate children excluded as heirs under the IBIA's interpretation of WELSA will be Indians, and the persons determined to be heirs will be non-Indians. Nevertheless, plaintiffs offer no evidence indicating that such circumstances will occur with any frequency, and the greater likelihood appears to be that all of the putative heirs will be of full or partial Indian heritage. Moreover, there is no indication in the record in the case at bar that any of the persons determined to be the heirs of Esther Bellecourt Smith are non-Indians who will benefit at plaintiffs' expense. Furthermore, for the above reasons the IBIA's decision is in compliance with the explicit requirements of WELSA, and the record contains no evidence to suggest that the BIA has otherwise misappropriated or mismanaged the funds from which WELSA compensation is derived. The government's trust obligation to the Indian tribes therefore does not appear to have been violated in this case.

## V. Indian Custom Law Marriage

Plaintiffs contest both the ALJ's determination that they are not legitimate children pursuant to an Indian custom law marriage, and the IBIA's determination that their appeal on that issue was untimely.

### A. Timeliness of Administrative Appeal

Pursuant to the DOI regulations governing IBIA appeals in WELSA heirship determination cases, a notice of appeal from an ALJ's decision must be filed with the IBIA within thirty days from the date of his or her final order. *See* 43 C.F.R. § 4.356(b). A failure to file a notice of appeal within the prescribed time period will result in its dismissal. *See id.*

In the case at bar plaintiffs never actually filed a separate appeal from the ALJ's decision with IBIA. Rather, the IBIA merely construed plaintiffs' response to the Area Director's appeal as such, to the extent that plaintiffs argued that the ALJ's resolution of the custom law marriage issue was erroneous. So construing plaintiffs' response, the IBIA held that it was not filed within the required time period under the regulations.[11]

Based on this finding, defendants contend that since plaintiffs' administrative appeal was not properly before the IBIA, this Court also lacks jurisdiction to consider it. In asserting this argument, defendants appear to rely on the implicit assumption that by neglecting to file a timely administrative appeal, plaintiffs have failed to exhaust their administrative remedies. They nevertheless have failed to analyze whether an administrative exhaustion requirement applies under the relevant statutes and the particular facts of this case.

Plaintiffs bring their appeal in this matter pursuant to the APA. The Supreme Court has interpreted the APA to require administrative exhaustion only in limited circumstances:

11. Plaintiffs do not dispute the IBIA's determination that they filed their response outside the prescribed thirty day time period. Thus,

assuming *arguendo* that their response constitutes a notice of appeal, the Court finds that it was untimely.

[W]here the APA applies, an appeal to 'superior agency authority' is a prerequisite to judicial review *only* when expressly required by statute or when an administrative action is made inoperative pending that review. Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become final under [the APA].

*Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Under *Darby,* plaintiffs' failure to appeal the ALJ's determination in a timely fashion only precludes judicial review if WELSA or an applicable DOI rule or regulation expressly requires administrative appeal prior to judicial review. Although defendants cite to no such rule or regulation, the Court recognizes that the DOI has enacted an exhaustion provision generally requiring appeal to the IBIA from ALJ decisions:

No decision of an [ALJ] or an official of the [BIA], which at the time of its rendition is subject to appeal to the [IBIA], shall be considered final so as to constitute agency action subject to judicial review under 5 U.S.C. § 704, unless made effective pending decision on appeal by order of the [IBIA].

43 C.F.R. § 4.314(a). Thus, if an ALJ's decision is subject to appeal to the IBIA, administrative exhaustion is required and judicial review is barred in the absence of such an appeal.[12]

The Court finds that under the circumstances of this case, plaintiffs' challenge to the ALJ's custom law marriage determination was not subject to an administrative appeal under the regulations enacted in connection with heirship determinations under WELSA. Those regulations provide that, "[a] party *aggrieved* by a final order of an [ALJ]" may file an appeal with the IBIA. 43 C.F.R. § 4.356(a) (emphasis added); *see also* 43 C.F.R. § 4.350(c)(7) (defining "appellant" in the WELSA heirship determination context as "a party *aggrieved* by a final order*" of an ALJ) (emphasis added). The language chosen by the DOI in this context substantially contrasts with the language that it has used when enacting regulations governing IBIA appeals in other contexts. *See* 43 C.F.R. § 4.320 (stating, with regard to appeals in probate matters, that such appeals may be filed by "[a] party in interest"); 43 C.F.R. § 4.331 (providing that "[a]ny interested party affected by a final administrative action" may file an appeal in non-probate matters involving Indians, except where the regulations provide otherwise).

■ Plaintiffs contend, and the Court agrees, that they were not aggrieved by the ALJ's June 12, 1997 Final Order. Although the ALJ decided against them on the custom law marriage issue, his Final Order conferred upon them all of the relief that they were seeking. Thus, although they may have disagreed with his resolution of a non-dispositive issue, they were not "aggrieved" by his order. A more broad interpretation of the phrase "party aggrieved" would force victorious parties in every case to appeal all adverse determinations in order to preserve their rights to judicial review.[13] Such a system would have the undesirable result of burdening

---

12. Plaintiffs have not argued that any of the commonly recognized exceptions to the exhaustion doctrine is applicable in this case. *See, e.g., White Mountain Apache Tribe v. Hodel,* 840 F.2d 675, 677–78 (9th Cir.1988) (discussing an exception to exhaustion requirements when administrative review would otherwise be futile); *Glisson v. United States Forest Svc.,* 55 F.3d 1325, 1327 (7th Cir. 1995) (acknowledging exceptions when the administrative tribunal lacks authority to provide the relief sought, when it has placed unreasonable restrictions on access to appeal, or when the delay would cause the plaintiff irreparable harm).

13. As plaintiffs point out, the DOI regulations at issue do not provide an extension of time, after an appeal is filed, for opposing parties to file cross-appeals as do the Federal Rules of Appellate Procedure. *See* Fed. R.App. P. 4(a)(3). Thus, in many cases a prevailing party under an ALJ's final order would have no way of knowing whether the order would be contested until too late to file an appeal of his or her own.

the IBIA with numerous appeals that otherwise would never need to be filed. The Court does not believe that the DOI intended such a result.

Having found that plaintiffs were not entitled to file an appeal with the IBIA, the Court concludes that they exhausted the administrative remedies available to them. No other form of administrative review is required under the regulations. For these reasons, direct judicial review of the ALJ's custom law marriage determination is proper.

### B. Plaintiffs' Status as Children of an Indian Custom Marriage

■ Although the Court finds that it has jurisdiction to consider plaintiffs' custom law marriage claim, it concludes that the ALJ's determination on this issue should be affirmed. Plaintiffs argue that, even under the Minnesota laws of intestacy in effect on March 26, 1986, they are entitled to inherit from the decedent because their parents were married at the time of their birth pursuant to Indian custom law.

This argument fails under a statute enacted by Congress in 1953, Pub.L. No. 83–280, 67 Stat. 589 (1953) (codified as amended at 28 U.S.C. § 1360) ("Public Law 280"). Public Law 280 provides Minnesota courts with civil jurisdiction to consider claims arising on Indian lands located within the state. *See id.* Importantly, the statute further provides that "those civil laws of [Minnesota] that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere in the State." *Id.* Although the statute expressly provides that existing tribal laws and customs must be given full force and effect in the determination of civil claims arising on Indian lands, such laws and customs are applicable only to the extent that they are "not inconsistent with any applicable civil law of the State." *Id.*

The administrative record reflects that plaintiffs' parents entered into a custom marriage under the traditions of the Chippewa tribe before they were born, however, there is no evidence that they entered into this marriage at any time before the enactment of Public Law 280 in 1953. At that time, the Minnesota legislature already had expressly abolished and held void any marriage entered into without a solemnized contract and a valid marriage license. *See* Minn.Stat. § 517.01. The Chippewa custom that recognizes marriage based only on cohabitation and an intent to live as husband and wife is in direct conflict with this statute. Given this conflict, Public Law 280 provides that the law of Minnesota controls. For these reasons, the cohabitation of Theodore Simon Smith and Alice Windom at the time of plaintiffs' birth does not give rise to a valid marriage, and plaintiffs' claim to legitimacy under Indian custom fails.[14]

Plaintiffs contend that a remand to the ALJ on this issue is appropriate nonetheless, because the ALJ erroneously failed to provide them with an adequate opportuni-

---

14. Plaintiffs emphasize that under Public Law 280, the state's jurisdiction over civil matters involving Indians is concurrent with that of the tribe. While this may be true, the issue in this case is not jurisdictional, but rather, a question of whether Indian custom or state law controls. Public Law 280 plainly provides that when the two are in conflict, as in this case, state law is applicable.

Plaintiffs also argue that the DOI has recognized tribal custom law in other WELSA heirship proceedings. *See* Final Order Determining Heirs, *In the Matter of the WELSA Heirship Determination of Clara Lizzie Pemberton*, No. WC 9400017 (December 6, 1994);

*Estate of Matthew Cook*, 9 IBIA 52 (1981). Both cases cited by plaintiffs are inapposite. *Cook* involved a tribe outside the State of Minnesota, and therefore, neither WELSA nor the laws of Minnesota were applicable to that case. Moreover, *Pemberton* is an unpublished decision, and plaintiffs have failed to submit a copy of it for the Court's consideration. Nevertheless, plaintiffs have not disputed defendants' assertion that *Pemberton* involves an Indian custom marriage occurring between 1942 and 1946, before Public Law 280 was enacted. For this reason *Pemberton* is also distinguishable.

ty during the administrative proceedings to fully develop the record. Other than making this bald assertion, however, they have not shown that they were in any way deprived of such an .opportunity. Moreover, they have failed to indicate what evidence they might hope to develop on remand, or to demonstrate how such evidence might alter the result in this case. Lacking any substantial basis upon which to criticize the administrative proceedings or the ALJ's holding on the merits of this issue, the Court affirms the ALJ's decision.

## VI. Conclusion

For the above reasons, plaintiffs' appeal in this matter is denied. The Court notes, however, that it arrives at this conclusion with a great deal of reluctance. In reaching his initial heirship determination in this case, the ALJ described the Minnesota intestacy laws of 1986 which Congress, through WELSA, has frozen in time, as "archaic." The Court whole-heartedly agrees with this characterization. Apparently even the Minnesota legislature concurs, since soon after the enactment of WELSA it amended the laws at issue. The usurpation of individual rights on the basis of illegitimacy is distasteful, especially in circumstances such as these, in which such rights are denied in the face of the long-standing traditions and customs of native people. The result in this case is even more unpalatable, given that it appears to arise from the unfortunate happenstance of WELSA's enactment just a few months too early. Although a simple amendment to WELSA would lead to more just result, it is not the province of this Court to enact legislation. The remedy for this injustice lies with the Congress of the United States. The Court accordingly affirms the IBIA's decision.

### ORDER

Based on the foregoing, and all of the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion for summary judgment [Docket No. 17] is **GRANTED**.

2. Plaintiffs' motion for summary judgment [Docket No. 21] is **DENIED**.

3. Plaintiffs' complaint is **DISMISSED, with prejudice.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**